IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JOHN DOE,

    *Plaintiff*

v.

NORFOLK STATE UNIVERSITY,

BOARD OF VISITORS OF
NORFOLK STATE UNIVERSITY,

and

FICTITIOUS PERSONS A-Z.,

    *Defendants.*

Civil Case No.

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff John Doe ("Plaintiff" or "Doe"), by counsel, and moves this Honorable Court for Judgment against the Defendants Norfolk State University; Board of Visitors of Norfolk State University; and Fictitious Persons A-Z; and in support of his complaint, states as follows, *to-wit*:

I. **INTRODUCTION**

1. This suit is being brought pursuant to Title IX of the Education Amendments of 1972 (*i.e.*, 20 U.S.C. §§ 1681, *et seq.*) ("Title IX").

2. Beginning in January of 2021, Coach Latrell Scott, previous head coach of the NSU football team, began actively recruiting John Doe to attend Norfolk State University. Plaintiff reported to practice in June of 2021.

3. Plaintiff was befriended by members of the Norfolk State University football team, including S.M., who was an upperclassman. S.M. induced Plaintiff into a friendship by

offering him use of his car and inviting him to meals and parties with other football players. Shortly thereafter, the hazing began. The hazing which began with crotch grabbing and voyeurism led to an attempted rape.

4. The Norfolk State University football coaches had actual knowledge of the hazing activities occurring on the football team and the behavior was ignored; as one coach put it, "They were teammates," and "They were doing it to each other."

5. At one point a coach had warned S.M. that "someday you're going to play with the wrong person and it's going to catch up with you." Norfolk State University coaches knew of this hazing and allowed the creation of a culture that enabled sexual assault and hazing of younger football players to include retaliation. Before Coach Scott left Norfolk State University in March of 2021, Coach Scott had warned Norfolk State University football players that if they were gay that was fine, but not to do that "stuff" at practices. The current coaching staff also knew of this culture of sexual assault and hazing among the football team but did not take reasonable actions to prevent these events.

6. On August 15, 2021, Plaintiff invited S.M. and others to his apartment to watch a movie. Towards the end of the night S.M. threatened to break the glass door of Plaintiff's bedroom and to destroy items in Plaintiff's bedroom. These threats were made by S.M. to lure Plaintiff into his bedroom. When Plaintiff entered his bedroom, S.M. turned off the light, closed the door, and pushed Plaintiff face down on his bed, straddling Plaintiff from behind while holding him down against his will until it was stopped by another person.

7. A little more than a month prior to the attempted rape of the Plaintiff, the coaching staff and Norfolk State University were made aware of another freshman Norfolk State University football player being sexually assaulted by an upperclassman Norfolk State University football

player.[1] Norfolk State University had created a culture – spanning two coaching staffs – that enabled sexual assault and hazing of younger football players. The university did nothing to protect the Plaintiff even though it could have reasonably taken steps to prevent these events from happening.

8.  Plaintiff was retaliated against by other members of the football team when Norfolk State University finally acted.

## II.  JURISDICTION

9.  This Court has federal question jurisdiction under 28 U.S.C. § 1331 and civil rights jurisdiction under 28 U.S.C. § 1343.

10. Plaintiff has delivered notice regarding his state law claims against the university pursuant to the Virginia Tort Claims Act ("VTCA"), Code of Virginia § 8.01-195.1, *et seq*. However, neither the six-month waiting period for the Commonwealth to review these state law claims has elapsed, nor has the Plaintiff received any notice of his state law claims being denied. Therefore, Plaintiff is presently unable to pursue these state law claims pursuant to the VTCA as they are not ripe for adjudication. However, Plaintiff intends to seek leave of the Court to amend this Complaint if he receives a denial of his claim or when the six-month period elapses. If and when either event occurs, this Court will have supplemental jurisdiction over these state law tort claims under 28 U.S.C. § 1367.

11. All relief available under the foregoing statutes is sought herein by the Plaintiff.

12. Personal jurisdiction exists over the Defendants as each Defendant has had sufficient minimum contacts with Virginia and this district because of residence within Virginia.

---

[1] See *Fahey v. Norfolk State University and Board of Visitors of Norfolk State University* filed June 1, 2022.

Alternatively, personal jurisdiction exists because all claims alleged in this complaint arise from actions occurring in Virginia and in this district.

### III. VENUE

13. Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

14. Assignment to the Norfolk Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(3) and 3(C) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

### IV. PARTIES

15. Plaintiff John Doe is of full age and majority and is a resident of the Commonwealth of Virginia. At all relevant times, Plaintiff was a student attending Norfolk State University and a player on the university's football team.

16. Defendant Norfolk State University is a public university formed under the laws of the Commonwealth of Virginia. It is governed by Defendant Board of Visitors of Norfolk State University, which approves all Title IX policies and procedures for the university. (Collectively, these Defendants shall be referred to as "NSU.")

17. Fictitious Persons A-Z are those persons, firms, corporations, or other entities who are in any way responsible to the Plaintiff for the damages he has sustained and whose identities are at this time unknown but will be added by appropriate amendments when ascertained.

### V. FACTS

18. NSU is a public university located in Norfolk, Virginia, founded in 1935.

19. NSU's football team, the Norfolk State Spartans, participates in NCAA Division 1 as part of the Mid-Eastern Athletic Conference.

20. Upon information and belief, NSU's current and past football coaches witnessed NSU football players grabbing the crotches of other players but failed to report this behavior to the Title IX Coordinator.  Over the years, this behavior has become normalized among the team and has been referred to by another coach as being "playful."  This coach further stated, "We just never took [it] seriously."

21. Based on information reported by a witness, the prior head coach, Latrell Scott, knew of the hazing and sexual harassment that was taking place at NSU.  According to this witness, Coach Scott repeatedly told the NSU football players not to engage in this type of sexual harassment behavior.  Nevertheless, these requests – not being followed up with stern discipline or the requisite Title IX investigations – fell on deaf ears.

22. Incoming freshman players would learn that upperclassmen would perpetrate acts of hazing in the form of fondling, groping, and voyeurism.  If an NSU football player was ever told to "size up," it was understood that he was to drop his pants and expose his penis to the other player, whereupon the two players would compare penis sizes.  Plaintiff was also aware of FaceTime video calls with at least one NSU upperclassmen football player exposing his genitalia to other NSU football players. One video recording shows an NSU football player holding down a freshman NSU football player and "dry humping" him from behind while others looked on and laughed.

23. NSU had notice of these "grooming" behaviors, which included several upperclassmen football players repeatedly groping, grabbing, and making video calls with their

genitalia exposed to younger players on the team. However, NSU swept these allegations under the proverbial rug.

24. Oblivious to these concerns, Plaintiff made the decision to attend NSU and play football. Plaintiff passed on other opportunities to play football at other schools.

25. In July 2021, S.M., an upperclassman football player at NSU, befriended Plaintiff and made assurances to Plaintiff and to Plaintiff's family that he would "look after" and "protect" Plaintiff.

26. On various occasions in August 2021, S.M. grabbed Plaintiff's crotch multiple times both on and off the football field. Plaintiff repeatedly told him to stop. During this same period, S.M. would video call Plaintiff while exposing his penis on the FaceTime video calls.

27. Upon information and belief, NSU football staff were aware that S.M. would video call NSU football players while exposing his penis on FaceTime video calls.

28. Upon information and belief, NSU football coaches knew of the sexual harassment and sexual assault that S.M. and other NSU football players would practice, but NSU football coaches looked the other way since S.M. was one of the better players.

29. Defendant NSU had knowledge of S.M.'s violent tendencies as he was removed from on-campus housing for destroying the door to his dormitory room.

30. On or about August 15, 2021, S.M. visited Plaintiff's apartment. S.M. threatened to break items in Plaintiff's room and made his way back to Plaintiff's bedroom to carry out this threat. Plaintiff immediately followed S.M. as S.M. has been known to punch holes in walls and had previously been removed from on-campus housing due to destruction of the premises. Plaintiff entered his bedroom and S.M. turned off the light, shut the door, forcefully pinned Plaintiff face-down on the bed and attempted to rape Plaintiff. Being pinned to the bed and unable to move,

Plaintiff began to scream and thrash to get S.M. off him. Plaintiff could feel S.M.'s erect penis between his intergluteal cleft. Only after another individual had come into the room did S.M. get off the Plaintiff and run out the home.

31. On or about August 16, 2021, before football practice S.M. approached Plaintiff in the locker room and tried to shake hands. Plaintiff confronted S.M. by stating, "You know what you did to me." S.M. responded to Plaintiff, "Oh, you mean when I punished your s--ts?"[2] Plaintiff immediately left the locker room with S.M. following him to the practice field. Once on the practice field, S.M. approached Plaintiff with outstretched arms to hug Plaintiff, Defendant then reached down and grabbed Plaintiff's genitalia with teammates and coaches observing.

32. When Plaintiff reported the sexual assaults to Head Coach Dawson Odums, the latter, in turn, reported the incident to the Title IX coordinator, James Robinson. Neither Coach Odums nor Mr. Robinson reported the incident to the NSU Police Department as required by the NSU's policies, even though they both were Campus Security Authorities (CSA).

33. On August 19, 2021, a meeting was conducted between Coach Odums and Mr. Robinson with the Plaintiff. At this meeting, Plaintiff stated he was filing a complaint and wanted the assault to be investigated by NSU. During this meeting Plaintiff was offered to be moved to on-campus housing with security posted outside of his dormitory room. No other interim measures were offered to Plaintiff during this meeting. Plaintiff was fearful to be alone with NSU football players and had to repeatedly request to stay in a hotel room alone when the NSU football team traveled to away games to receive this supportive measure.

34. Beginning on or about August 19, 2021, Plaintiff was retaliated against by members of the NSU football team. Plaintiff was repeatedly called a "snitch" and told "no one likes you."

---

[2] Explained by Plaintiff and NSU football player to mean a derogatory sexual term to mean having sex very aggressively from behind.

Plaintiff was told to apologize to S.M. for ruining Defendant's chance to play football his final year of eligibility.

35. On or about August 20, 2021, Plaintiff's parents met with Coach Odums and Mr. Robinson regarding the safety and psychological health of Plaintiff. During this meeting Coach Odums stated "leave it to me to get rid of the other bad seeds" and implied he was going through a list of people to "let go." Coach Odums told Plaintiff and his parents that he had inherited this problem.

36. NSU was aware of retaliation taking place against Plaintiff. On September 1, 2021, Mr. Robinson sent an email to Defendant Odums indicating that two coaches went to visit S.M. "to see how he was doing." The email also acknowledges other NSU football players telling Plaintiff he needs to apologize to S.M. and acknowledges that Plaintiff may not be "safe on this week's road trip based on the gang of S.M. supporters." See Exhibit 1.

37. On or about September 13, 2021, two pairs of Plaintiff's Nike cleats were stolen from his locker.

38. On October 1, 2021, Mr. Robinson sent a memo to NSU officials for review, which dismissed the Title IX complaints filed against S.M. This notice was not sent to Plaintiff until November 9, 2021.

39. On October 1, 2021, Mr. Robinson sends an email update to other NSU employees acknowledging that the Title IX regulations do not require a signed complaint to move forward with the investigation. See Exhibit 2.

40. On October 2, 2021, Plaintiff left the NSU football team because the hazing and retaliation were intolerable.

41. On October 11, 2021, almost two months after the sexual assault, Mr. Robinson sent an email to an outside investigator inquiring on the cost of Title IX investigative services. See Exhibit 3.

42. On October 13, 2021, an interim measures request was sent on behalf of Plaintiff. This request was ignored by Mr. Robinson.

43. On November 9, 2021, Plaintiff received Notice of Dismissal indicating that the August 15, 2021, assault and the August 16, 2021, assault would be investigated as a student conduct matter rather than a Title IX investigation.

44. On November 11, 2021, Plaintiff sent an email to Mr. Robinson inquiring into dismissal of the August 16, 2021, Title IX complaint as that assault had occurred on campus.

45. On November 22, 2021, over three months after the sexual assaults on campus, Plaintiff was interviewed regarding the August 15, 2021, attempted rape.

46. On November 29, 2021, after Plaintiff was interviewed by an external investigator, Mr. Robinson sent an email indicating that the August 16, 2021, assault would be investigated under Title IX.

VI. **CAUSE OF ACTION**

*VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972: HOSTILE EDUCATION ENVIRONMENT AND DELIBERATE INDIFFERENCE*

47. Plaintiff re-alleges and incorporates by reference the allegations set forth in the entirety of this Complaint as if fully set forth herein.

48. NSU is responsible for the acts and omissions of an employee when the employee is acting within the scope of their employment and on behalf of their employer. At all times

relevant, NSU employees named in this complaint were acting in the course and scope of their authority at NSU and on behalf of NSU.  Thus, NSU is responsible for their acts or omissions.

49.     At all relevant times, NSU was receiving federal funding as contemplated by Title IX.  Therefore, Title IX abrogates NSU's Eleventh Amendment sovereign immunity. *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 71-73 (1992); *see also Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287-90 (1998).

50.     Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

51.     According to the U.S. Department of Education's 2020 published rule on Title IX, all schools receiving federal financial assistance must respond to

> … allegations of sexual harassment consistent with Title IX's prohibition against sex discrimination.  These regulations are intended to effectuate Title IX's prohibition against sex discrimination by requiring recipients to address sexual harassment as a form of sex discrimination in education programs or activities.  The final regulations obligate recipients to respond promptly and supportively to persons alleged to be victimized by sexual harassment, resolve allegations of sexual harassment promptly and accurately under a predictable, fair grievance process that provides due process protections to alleged victims and alleged perpetrators of sexual harassment, and effectively implement remedies for victims.

85 FR 30026 (effective August 14, 2020).

52.     Under the Title IX final rule issued by the U.S. Department of Education, a school is deliberately indifferent if the response is not reasonable in light of the known circumstances. To this end, a school's Title IX Coordinator is required to promptly contact the complainant, provide supportive measures, and explain the process of filing a formal complaint.

53.     NSU Title IX policy states, "Every NSU employee who is informed about an allegation of sexual misconduct involving any student, staff, or faculty member, is required to

notify the Title IX Coordinator, or his or her designee either directly or through an appropriate reporting mechanism such as email or by phone."

54. NSU's Title IX policy also states, "[C]ertain NSU employees, called 'Responsible Employees' are required to report to the Title IX Coordinator all information disclosed to them about an incident of Prohibited Conduct." At all material times, Head Coaches Scott and Odums and their assistant coaches were "Responsible Employees" under the NSU Title IX policy.

55. NSU has a policy to address hazing that is provided to the students at the beginning of the spring and fall semesters. The policy is also published in the student handbook and distributed to the University community. The policy defines *hazing* as "any action or situation, whether on or off University premises, that is harmful or potentially harmful to an individual's physical, emotional, academic or psychological well-being, regardless of an individual's willingness to participate or its bearing on his/her membership status." The NSU hazing policy requires all University employees and students to report all "real and suspected acts of hazing to the NSU Police Department" and prohibits retaliation for reporting. In addition, the REACH Act requires institutions of higher education (IHEs) that participate in federal student-aid programs to report hazing incidents and implement hazing education programs. Specifically, the Act requires each IHE to disclose hazing incidents that were reported to campus officials in its annual security report.

56. NSU is responsible for ensuring all responsible employees and athletic department staff are properly trained in Title IX and are supervised in performing their jobs (*see* 34 C.F.R. § 106.45 (b)(1)(iii)). Coach Odums and Coach Torrey had not completed Title IX training between June 1, 2021, and November 1, 2021. Coach Odums completed the training for campus security

authorities (CSA) on November 1, 2021, well after the start of the football season and well after these sexual assaults had taken place.

57. The Title IX regulations require:

> … reasonably prompt time frames for conclusion of the grievance process, including reasonably prompt time frames for filing and resolving appeals and informal resolution processes if the recipient offers informal resolution processes, and a process that allows for the temporary delay of the grievance process or the limited extension of time frames for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action.

34 C.F.R. § 106.45(b)(1)(v). Furthermore, at postsecondary institutions,

> … the recipient's grievance process must provide for a live hearing. At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally….

34 C.F.R. § 106.45(b)(6)(ii).

58. NSU had actual notice of the sexual assault and retaliation against the Plaintiff. However, NSU did not follow the proper procedures in reporting or providing interim measures for the Plaintiff.

59. NSU's investigation and response to the Plaintiff's sexual assault complaints were insufficient. NSU's response did not comply with basic due process requirements or accepted Title IX response requirements as outlined in guidance from the U.S. Department of Education, Office for Civil Rights.

60. NSU failed to follow its own policies in responding to or investigating complaints of sexual assault, which include specific deadlines on providing notification to the parties involved, time frames of the investigation, details on how interviews will be conducted, and the final reports and recommended findings to be provided to the parties in the investigation. This created a hostile

educational environment for the Plaintiff, thereby necessitating his withdrawal from the NSU football team and from the university, itself, for his own well-being.

61. Had NSU provided meaningful follow-up to his complaint and notified him of the same in a timely manner, Plaintiff would not have left school.

62. NSU had an obligation to address Plaintiff's report of sexual assault against S.M. and remedy any resulting hostile environment created for Plaintiff on campus because of the sexual assault, such as retaliation from other teammates, as it constituted severe and objectively offensive sexual harassment, which is a form of prohibited sex-based discrimination under Title IX. NSU also had an obligation to address Plaintiff's report of sexual assault against S.M. because that sexual assault was part of a pervasive pattern of sexual harassment that NSU had actual knowledge was occurring routinely by the football team.

63. At all material times, NSU exercised substantial control over S.M. because he was an NSU football player who could have been removed from the team for prior rule infractions.

64. After receiving actual notice of the on-campus sexual assault, NSU had an obligation to provide Plaintiff with prompt and equitable interim remedies to ensure his ongoing access to a safe campus free from a hostile environment. NSU also had an obligation to ensure his continued access to education programs and activities through the provision of reasonable academic, housing, and other available accommodations.

65. Despite its obligations to Plaintiff, NSU showed deliberate indifference to the sexual assault of Plaintiff by failing to provide him with prompt and equitable interim remedies and safety measures. Plaintiff understood that other players, mindful of what had transpired, would continue to ridicule him for even reporting S.M., thereby creating a hostile environment. Thus, by

its actions and omissions, NSU effectively denied and/or limited Plaintiff's ability to participate in or to receive benefits, services, or opportunities from NSU's educational programs or activities.

66. NSU failed to take Plaintiff's complaint of sexual assault seriously. NSU's actions and inactions created and/or contributed to the ongoing hostile educational environment that Plaintiff suffered and others have continued to suffer.

67. The university had actual knowledge of sex discrimination including sexual harassment and sexual assault occurring by members of the NSU football team and acted with deliberate indifference towards the rights of Plaintiff to a safe education environment. NSU had actual knowledge as evidenced by the passing of this problem from one Head Coach to another Head Coach. NSU had actual knowledge as evidenced by the freshman NSU football player who reported a month earlier of sexual assault and hazing by upperclassman NSU football players.[3] This deliberate indifference impaired Plaintiff's ability to participate in and benefit from educational programs and activities at NSU.

68. NSU did not promptly conclude the investigation with a finding and did not take proactive steps to prevent its recurrence or remedy its effects. NSU knew of the sexual harassment and did not take appropriate steps to ensure Plaintiff could continue to benefit from the school's programs. If NSU had not been deliberately indifferent to the reported sexual assault and had not taken self-serving action to protect its own interests, Plaintiff would have exercised his opportunity to play football and pursued his education at NSU.

69. NSU had knowledge of this pervasive culture of sexual harassment on the football team and acted with utter disregard in investigating and preventing further harassment to the Plaintiff. The Defendants' acts, omissions, policies, and customs resulted in sexual harassment

---

[3] See *Fahey, supra*.

that was so severe and pervasive it denied Plaintiff the right to participate as both a student and an athlete at NSU.  Thus, Plaintiff was denied equal educational opportunities in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a).

70. Plaintiff suffered financial loss from being denied equal educational opportunities in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a). Plaintiff suffered the loss of his scholarship to NSU, loss of room and board, loss of educational opportunity, loss of future income, and loss of income as derived from his name, image, and likeness as allowed by the NCAA.

71. As a result of NSU's deliberate indifference and hostile education environment Plaintiff was forced to withdraw from NSU and the football team and has suffered pecuniary and non-pecuniary damages in the amounts to be adduced at trial.

## JURY TRIAL DEMANDED

Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendants as follows:

(a) That the Court declare that Defendant's actions, policies, and practices complained of herein violated Plaintiff's rights under Title IX of the Education Amendments of 1972;

(b) Injunctive relief requiring NSU to redress its violations of Title IX, including (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment and hazing policy, including procedures for effective reporting of sexual harassment and hazing incidents, an effective and immediate crisis response, and an expended victim assistance and protection program; (2) adopting a "zero tolerance policy" under which there will

be expedited proceedings and punishment proportional to the offense for violation of sexual harassment and hazing policies; and (3) providing for an annual, independent review by the Office of the President, with the participation of outside reviewers, of Athletic Department compliance with the sexual harassment and sexual hazing policies;

      (c)    An award of damages against NSU in an amount to be established at trial, including, without limitation, payment of Plaintiff's scholarship and tuition to NSU to include room and board; payment of Plaintiff's expenses incurred as a consequence of the sexual assaults; damages for deprivation of equal access to the educational benefits and opportunities provided by NSU; damages for loss of future income; damages for loss of income as derived from Plaintiff's name, image, and likeness as allowed by the NCAA; and damages for past, present, and future emotional and psychological harm where allowed by law;

      (d)    An award of pre- and post-judgment interest;

      (e)    An award of cost and attorney fees, pursuant to 42 U.S.C. § 1988(b); and

      (f)    Such other relief as is just and equitable.

      Respectfully Submitted,

_____/s/_____
Diane P. Toscano, Esq.
Virginia Bar No. 73478
TOSCANO LAW GROUP, P.C.
1244 Perimeter Parkway, Suite 443
Virginia Beach, Virginia 23454
Tel:   (757) 821-7972
Fax:   (757) 903-0186
Diane@toscanolawgroup.com
*Attorney for Plaintiff John Doe*